**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| LOUIE GOMEZ, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREYSTAR MANAGEMENT SERVICES, LLC, and GREYSTAR CALIFORNIA, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                     1

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................3

JURISDICTION AND VENUE ..........................................................................................3

THE PARTIES .....................................................................................................................4

FACTUAL ALLEGATIONS ...............................................................................................5

      I.      The San Francisco Administrative Code Prohibits the Use of
            Algorithmic Devices to Set Rents or Manage Occupancy Levels ...........................5

      II.     RealPage's Algorithmic Devices and/or Software .....................................................7

      III.    Yardi's Algorithmic Devices and/or Software ..........................................................12

      IV.    Defendant Greystar Management Admits It Used RealPage's and
            Yardi's Software.......................................................................................................23

      V.     The Use of Algorithmic Devices to Set Rents or Occupancy Levels
            Harms San Francisco Tenants ..................................................................................25

CLASS ALLEGATIONS.....................................................................................................27

CAUSES OF ACTION.........................................................................................................29

PRAYER FOR RELIEF ......................................................................................................31

DEMAND FOR JURY TRIAL ...........................................................................................31

Plaintiff Louie Gomez ("Plaintiff"), by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge, against Greystar Management Services, LLC ("Greystar Management"), and Greystar California, Inc. ("Greystar California" and together with Greystar Management, "Defendants").

**NATURE OF THE ACTION**

1. San Francisco Admin. Code c. 37, § 37.10C(b) prohibits a landlord from using an algorithmic device when setting rents or occupancy levels for residential dwelling units in San Francisco.

2. In other words, it is illegal for a landlord to use software that performs calculations using non-public competitor data to advise the landlord on rental prices or how many units to rent.

3. Despite this clear mandate, Defendants are landlords who use algorithmic devices to set rents or occupancy levels for residential dwelling units in San Francisco.

4. Under San Francisco Admin. Code c. 37, § 37.10C(d)(2), "tenant[s] may file a civil action for violations of subsection (b), for injunctive relief, money damages, and/or civil penalties of up to $1,000 per violation."

5. Thus, pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action, on behalf of himself and those similarly situated, to redress Defendants' violations of San Francisco Admin. Code c. 37, § 37.10C(b).

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendants.

7. The Court has personal jurisdiction over Defendants because Defendants have purposefully directed their activities at forum residents, have purposefully derived benefit from these forum activities, and have purposefully availed themselves of the privilege of conducting activities

within the forum.  Defendants conduct substantial business in this District by operating and/or managing multiple rental residential properties in this District, including the multifamily rental property that Plaintiff resides in.  Defendants have, at all times relevant hereto, systematically and continually conduct, and continue to conduct, business in California, including within this District.  Defendants have intentionally availed themselves of the benefits and privileges of the California and San Francisco rental market specifically, and have profited therefrom.  Thus, Defendants have "certain minimum contacts" with California such that exercising personal jurisdiction over Defendants would not "offend traditional notions of fair play and substantial justice."  *Calder v. Jones*, 465 U.S. 783, 788 (1984).

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## THE PARTIES

9.      Plaintiff Louie Gomez is an adult citizen of the state of California and is domiciled in San Francisco, California.

10.      Plaintiff Gomez is a tenant at a Greystar-managed multifamily rental property in San Francisco, California.  Plaintiff entered a one-year lease with a start date in or around November 2023.  Plaintiff renewed his lease in or around November 2025.

11.      Defendant Greystar Management Services, LLC ("Greystar Management"), is a Delaware limited liability company with its principal place of business in Charleston, South Carolina.  At all times material to this Complaint, Greystar Management has offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. Greystar Management acts as property manager for over 800,000 rental units nationwide, including rental units in California and this District.

12.      "Greystar Management Services" is named as the "Landlord" in Plaintiff's lease.

13.      Defendant Greystar California, Inc. ("Greystar California") is a Delaware corporation with its principal place of business in Charleston, South Carolina.  Greystar California contracts directly with property owners to manage rental properties located in the state of California and this

District.  As part of its management responsibilities, and at all times material to this Complaint, Greystar California has leased and managed the rental of residential units to consumers in California and this District.

14.    "Greystar California Inc" is named as the "Owner's Authorized Agent" in Plaintiff's lease.

## FACTUAL ALLEGATIONS

**I.    The San Francisco Administrative Code Prohibits the Use of Algorithmic Devices to Set Rents or Manage Occupancy Levels**

15.    On September 3, 2024, San Francisco passed an ordinance amending the Administrative Code, to prohibit landlords from using algorithmic devices to set rents or manage occupancy levels for residential dwelling units located in San Francisco.

16.    San Francisco Admin. Code c. 37, § 37.10C(b) provides:

> **Prohibition on Use.** It shall be unlawful for a landlord to use an algorithmic device described in subdivision (a) when setting rents or occupancy levels for residential dwelling units in San Francisco. Each separate month that a violation exists or continues, and each separate residential dwelling unit for which the landlord used the algorithmic device, shall constitute a separate and distinct violation.

17.    "Algorithmic device" means:

> [A] device commonly known as revenue management software, that uses one or more algorithms to perform calculations of non-public competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising a landlord on whether to leave a unit vacant or on the amount of rent that the landlord may obtain for that unit.

San Francisco Admin. Code c. 37, § 37.10C(c)(1).

18.    "Non-public competitor data" means:

> [I]nformation that is not available to the general public, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market.

San Francisco Admin. Code c. 37, § 37.10C(c)(2).

19.    The Ordinance became effective October 14, 2024.[1]

20.    The legislature enacted this ordinance to protect San Francisco tenants' rights, and the local rental housing market in San Francisco, from "large corporate landlords" like Defendants who don't "play by the normal rules":

> In recent years, a number of new revenue management software programs, often referred to as "algorithmic devices," have threatened to destabilize rental housing markets in cities nationwide, including San Francisco.
>
> …
>
> Often used by large corporate landlords, the software fuels the consolidation of corporate and private equity ownership of rental housing, at the expense of landlords large and small who are willing to play by the normal rules.[2]

21.    The legislature noted that "[n]umerous antitrust lawsuits have been filed against certain" entities.[3]  Indeed, Defendant Greystar Management Services, LLC was a large corporate landlord named in antitrust lawsuits.[4]  Nevertheless, the legislature passed the ordinance to provide "immediate relief" for San Francisco tenants:

> Instead of waiting for court processes which may take years to resolve, this ordinance prohibits the sale or use of algorithmic devices for the purpose of setting rents on residential dwelling units in San Francisco, to bring immediate relief to San Francisco tenants, as well as to put landlords who have been using these devices on equal footing with those who are willing to adhere to fair standards for setting rental rates.[5]

---

[1] The ordinance was later amended to additionally authorize tenant's rights organizations to enforce the prohibition against landlords' use of algorithmic devices to set rents or manage occupancy levels for residential dwelling units located in San Francisco. Ord. 169-25, File No. 240796, App. 9/5/2025, Eff. 10/6/2025, available at https://sfbos.org/sites/default/files/o0169-25.pdf.

[2] Ord. 224-24, File No. 240766, App. 9/13/2024, Eff. 10/14/2024, available at https://sfbos.org/sites/default/files/o0224-24.pdf.

[3] *Id.*

[4] *See, e.g.*, Complaint, *Platkin et al. v. RealPage, Inc. et al.*, No. 2:25-cv-03057, ECF No. 1 (D.N.J. Apr. 23, 2025); *District of Columbia vs. RealPage, Inc. et al.*, No. 2023-CAB-006762 (D.C. Super. Ct. Nov. 1, 2023); *see also id.*, Docket | Party Information ("Greystar Management Services, L.P. … *Also Known As* Greystar Management Services, LLC.").

[5] *Supra* note 1.

## II.    RealPage's Algorithmic Devices and/or Software

22.    RealPage, Inc. ("RealPage") is an enterprise resource planning software company that offers more than traditional property management services.  As relevant here, RealPage "licenses [various] revenue management products to property management companies and property owners (collectively, 'landlords')[.]"[6]

23.    These RealPage algorithmic software products include but are not limited to "AI Revenue Management ('AIRM'), YieldStar, and Lease Rent Options ('LRO'). RealPage's revenue management products are used by landlords to determine how to price floor plans and units in conventional multifamily rental housing, *i.e.*, multiunit apartments that they manage and lease."[7] RealPage algorithmic software products also include "Market Analytics."

24.    Since these tools amount to automated algorithms that suggests rents and occupancy in real-time, this complaint refers to them as "algorithmic devices."

### *AIRM/YieldStar*

25.    AIRM is the subsequent product to YieldStar, and YieldStar and AIRM leverage data in similar ways.

26.    AIRM uses landlords' data to train its machine learning model, make daily floor-plan price recommendations, and suggest unit-level prices. YieldStar uses the data to perform the latter two functions.[8]

27.    YieldStar made headlines "[i]n 2022, [when] ProPublica published an article diving into [this] 'secret' algorithm responsible for raising rents, tracing it back to a high-tech revenue

---

[6] DOJ Antitrust Division, NOTICE PURSUANT TO THE ANTITRUST PROCEDURES AND PENALTIES ACT, *United States et al. v. RealPage, Inc. et al. Response to Public Comments*, available at https://www.federalregister.gov/documents/2026/05/08/2026-09147/united-states-et-al-v-realpage-inc-et-al-response-to-public-comments.

[7] *Id.*

[8] *See* DOJ Antitrust Division, NOTICE PURSUANT TO THE ANTITRUST PROCEDURES AND PENALTIES ACT, supra note 6 ("RealPage uses nonpublic, competitively sensitive data to train its algorithmic models ('models') that AIRM leverages and to provide floor plan price recommendations and unit-level pricing to landlords when they are running AIRM or YieldStar.").

---

management company called RealPage."[9]

28. According to a March 2023 letter from four United States senators to then-Assistant Attorney General for the Antitrust Division of the DOJ, RealPage "indicated that 'YieldStar uses a *proprietary algorithm* to make recommendations to apartment providers about setting a price for rental units at their property[.]'"[10]

29. AIRM is RealPage's "flagship product[.]"[11] The AIRM "software tool ingests competitively sensitive, real-time transactional data—including occupancy rates, lease terms, and rent rolls—collected from competing landlords through over 50,000 monthly calls surveilling over 11 million total properties; and through an algorithmic process delivers pricing recommendations to those same landlords."[12]

30. To-date, the RealPage AI Revenue Management website[13] advertises its use of "AI-driven algorithms":

///

///

[9] M. Sethi et al., *Reprogramming Competition: Remedying Algorithmic Price-Fixing in U.S. v. RealPage*, Yale Univ. Thurman Arnold Project 2025 Student Papers, Paper 07 (May 2025), at 3, available at https://som.yale.edu/sites/default/files/2025-05/7.%20RealPage-%20TAP.pdf (citing Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, PROPUBLICA (Oct. 15, 2022), available at https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent)).

[10] Letter from Elizabeth Warren, Tina Smith, Bernard Sanders, and Edward J. Markey, United States Senators (Mar. 2, 2023), available at https://www.warren.senate.gov/imo/media/doc/2023.03.02%20Letter%20to%20DOJ%20re%20YieldStar%20(RealPage).pdf (emphasis added).

[11] M. Sethi et al., *Reprogramming Competition: Remedying Algorithmic Price-Fixing in U.S. v. RealPage*, at 6; *see also* David Bitton, *RealPage vs Yardi: Which Property Management Platform is Right for You?*, DOORLOOP (June 2, 2026), https://www.doorloop.com/blog/realpage-vs-yardi (last accessed June 29, 2026) ("RealPage has built its reputation on AI-driven revenue management and operational automation. Its flagship pricing tool, YieldStar (now part of the AI Revenue Management suite), uses algorithms to analyze market conditions and adjust rental prices dynamically often, daily to align with demand and occupancy goals.").

[12] M. Sethi et al., *Reprogramming Competition: Remedying Algorithmic Price-Fixing in U.S. v. RealPage*, at 6 (internal citation omitted).

[13] https://www.realpage.com/insights-analytics/revenue-management/ (last accessed June 19, 2026).

**Revenue Optimization**

AI-driven algorithms optimize revenue by providing precise recommendations for new and renewal leases.

31. This is done for setting both rent and occupancy: "Optimize with Confidence: Transparent and straightforward recommendations that leverage AI modeling to strategically balance *rent and occupancy*."[14]

32. The algorithm "captur[es] detailed lease terms and individual transactions" which "gives RealPage's algorithm deep insight into real-time market dynamics and competitor pricing."[15]

### Lease Rent Options

33. Lease Rent Options ("LRO") is an algorithmic tool that provides price optimization for apartments. LRO uses a different approach than YieldStar/AIRM. LRO generates pricing recommendations primarily from information about competitor prices users manually input into the system.[16]

34. RealPage acquired LRO in 2017 from The Rainmaker Group, "after months of scrutiny by the Antitrust Division of the Justice Department."[17] Similar to RealPage, The Rainmaker

---

[14] REALPAGE, REALPAGE AI REVENUE MANAGEMENT, https://www.realpage.com/insights-analytics/revenue-management/ (last accessed May 14, 2026) (emphasis added).

[15] M. Sethi et al., *Reprogramming Competition: Remedying Algorithmic Price-Fixing in U.S. v. RealPage*, at 8; *see also* Eric Weld, MassLandlords, Inc., MASSLANDLORDS.NET (Sep. 24, 2024), https://masslandlords.net/realpage-automated-price-optimization-software-in-doj-crosshairs-for-possible-antitrust-violations/ ("One sticky issue for RealPage is that some of the statistics incorporated by the AIRM algorithm are not public information. For example, the algorithm uses rent prices received on actual executed leases, as well as real lease terms – data not available to the public.").

[16] *See* DOJ Antitrust Division, NOTICE PURSUANT TO THE ANTITRUST PROCEDURES AND PENALTIES ACT, *supra* note 6 ("Owner Inputted Data refers to data that is directly inputted by landlords into a revenue management product and includes both public and nonpublic data. … [L]andlords directly exchanged competitively sensitive information to update rents within another RealPage revenue management product known as Lease Rent Options or LRO.").

[17] Heather Vogell, *Rent Going Up? One Company's Algorithm Could Be Why*, PROPUBLICA (Oct. 15, 2022), available at https://www.propublica.org/article/yieldstar-rent-increase-realpage-rent.

---

Group is a "provider of automated Revenue Management and profit optimization solutions in several industries."[18]

35.     An exhibit to RealPage, Inc.'s Form 8-K filed with the SEC discussing the LRO acquisition confirms that LRO is a "revenue management solution" similar to YieldStar/AIRM:

> LRO is a revenue management solution that empowers optimized pricing for over 1.5 million apartments. LRO, coupled with the recent acquisition of Axiometrics, expands RealPage's suite of solutions for precision data analytics and asset optimization for the rental housing industry.[19]

### Market Analytics

36.     "Market Analytics is the multifamily industry's leading intelligence platform for market-rate, student housing, and Build-to-Rent communities …. [I]t delivers clear visibility into market, submarket, and asset performance with daily updates on rents, concessions, floor plans, and occupancy—helping teams turn data into actionable insights."[20]

37.     RealPage designed Market Analytics software for, *inter alia*, "Property Managers" like Defendants in the "multifamily industry, providing robust and granular market intelligence for a wide range of property types, including conventional apartments"[21] like Plaintiff's multifamily residential apartment unit.

38.     To-date, RealPage concedes on its publicly available website that "RealPage Market Analytics integrates RealPage's proprietary historical apartment data,"[22] among other data:

---

[18] *See* RealPage® to Acquire Lease Rent Options, LRO®, available at https://www.sec.gov/Archives/edgar/data/1286225/000128622517000008/0001286225-17-000008-index.html; https://www.sec.gov/Archives/edgar/data/1286225/000128622517000008/a20170227_prxriptide-01.htm.

[19] https://www.sec.gov/Archives/edgar/data/1286225/000128622517000008/a20170227_prxriptide-01.htm

[20] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026).

[21] *Id.*, Frequently Asked Questions (last accessed June 29, 2026).

[22] *Id.*, Frequently Asked Questions (last accessed June 29, 2026).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    10



39.     Market Analytics is "[p]owered by Lumina AI" to provide "daily updates on **rents**, concessions, floor plans, and **occupancy**—helping teams turn data into actionable insights."[23]

///

///

///

---

[23] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026).

40. RealPage boasts that the "proprietary" data available to landlords through this algorithmic software "makes it easy to gain … niche level granularity, … and other key insights powering comprehensive multifamily trends."[24] This data is provided to landlords in real-time:

> Asset Intelligence delivers ***instant***, data-driven insights … and reduces analysis time from hours to seconds. It enhances organizational effectiveness by providing granular … ***rent comparisons***, … and highly configurable comp and assumption analysis.[25]

41. In addition to Market Analytics providing "AI [Artificial Intelligence] Forecasting," the Market Analytics software uses algorithms:

> Rely on our automated **True Comps** selection algorithms, driven by enhanced RealPage Data Science models, that intelligently select ideal rent comps and sales comps based on property attributes and performance to underwrite and evaluate more deals faster.[26]

42. To date, RealPage admits its platform allows access to: "**Proprietary**"—*i.e.* nonpublic—"apartment data covering millions of units across 425+ markets[.]"[27]

| No other multifamily market research platform has our data resources: | | |
| --- | --- | --- |
| Proprietary apartment data covering millions of units across 425+ markets | MSCI Real Capital Analytics sales data covering $2.9T in MF transactions over 25 years | Historical apartment data spanning 30+ years and multiple market cycles |

## III.  Yardi's Algorithmic Devices and/or Software

43. Similar to RealPage, Yardi Systems, LLC ("Yardi") is a real estate software company with an "AI-enabled platform"[28] that includes, *inter alia*, property management software.

44. Yardi has admitted that "as of August 7, 2024, Yardi … maintains property profiles

---

[24] *Id.*

[25] *Id.* (emphasis added).

[26] RealPage PDF Flyer, Customized Market Visibility & AI Valuation for Smarter Answers Faster, available at https://www.realpage.com/insights-analytics/market-analytics/?showPdf=true.

[27] REALPAGE, MARKET ANALYTICS, https://www.realpage.com/insights-analytics/market-analytics/ (last accessed May 14, 2026) (emphasis added).

[28] YARDI, ELEVATE YOUR REAL ESTATE WITH YARDI, https://www.yardi.com/ (last accessed June 11, 2026) (Yardi offers "leading real estate products").

for approximately 120,301 properties and 22,543,728 units."[29]

45.     As explained in more detail below, Yardi is able to suggest and/or calculate Defendant's rental rates by using aggregated data in its database.  Yardi says that "We"—i.e., Yardi—determines rent rates.[30]

**Yardi Voyager**

46.     The Yardi property management system is called Yardi Voyager.

47.     "Yardi Voyager is a comprehensive property management software platform designed for real estate companies."[31]  Yardi Voyager is specifically recommended for property owners like Defendant Greystar whose management portfolio exceeds 500 units.[32]

48.     "What makes Yardi distinct from most property management software is its single-database architecture."[33]

49.     As a single-database architecture, "[e]very module in the [Yardi] ecosystem, … *reads from and writes to the same underlying database*."[34]  In other words:

> There is no middleware, no nightly sync, and no import files between modules. …. When a lease is executed online, the charge codes populate automatically across every module that references lease data.[35]

---

[29] Yardi Systems, Inc.'s Answer To Plaintiffs' Consolidated Class Action Complaint, *In re Yardi Revenue Management Antitrust Litigation*, No. 2:23-cv-01391-RSL, ECF No. 394 ¶ 11 (W.D. Wash. Apr. 21, 2025).

[30] *See generally* YARDI, HOW WE DETERMINE A MULTI-FAMILY MARKET STANDARD RENT, available at https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions/How-We-Determine-A-Market-Standard-Rent (last accessed June 11, 2026).

[31] YARDI, VOYAGER SUITE, FAQ, https://www.yardi.com/suite/voyager-suite/ (last accessed June 11, 2026).

[32] Ben Berger et al., *What Is Yardi? The Complete Guide to Yardi's Software Platform*, BC SOLUTIONS, INC., https://www.bcsolut.com/resources/what-is-yardi (last accessed June 11, 2026). ("Voyager is typically deployed by operators managing portfolios of 500 units or more, ….").

[33] Ben Berger et al., *What Is Yardi? The Complete Guide to Yardi's Software Platform*, BC SOLUTIONS, INC., https://www.bcsolut.com/resources/what-is-yardi (last accessed June 11, 2026). BC Solutions, Inc. was founded in 2007 and is a team of Yardi specialists who "bring[] dedicated Yardi expertise to commercial and multifamily operators so teams can align configuration, reporting, workflows, and support around how they operate."  https://www.bcsolut.com/.

[34] Ben Berger et al., *What Is Yardi? The Complete Guide to Yardi's Software Platform*, BC SOLUTIONS, INC., https://www.bcsolut.com/resources/what-is-yardi (last accessed June 11, 2026). (emphasis added).

[35] *Id*.; *see also* https://www.relayhumancloud.com/blog/what-is-yardi-software/ ("Yardi works as a single control panel for a real estate operation. Updates made in one part of the system

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

13

50. A bill study by the Virginia Joint Commission on Technology & Science warns that algorithms can "draw on … data source[s] across competing landlords" and "*any* of the nonpublic data inputs … can be used to train and execute the algorithmic pricing software":[36]

> Generally, when landlords and property managers use digital platforms to manage the operation of their property units, they rely on property management software, such as … *Yardi*.[37]
>
> **Property management software** houses operations information, such as property details, tenant information, financial data, and maintenance records. Property details include information like unit floor plans, number of units, square footage, occupancy levels, amenities, and lease terms (i.e., effective rent, start/end dates).[38]

*Yardi Matrix*

51. Yardi® Matrix is "the industry's most comprehensive market intelligence tool"[39] which provides "easy access to data … **covering over 92% of the U.S. population**."[40]

52. Specifically, Yardi Matrix pulls data from Yardi's property management software (Voyager), which houses detailed, nonpublic information that is input by landlords.

53. Yardi confirms this, stating: "Yardi Matrix also uses data in the Yardi property management system stack[.]"[41]

54. Yardi further states that Yardi Matrix accesses "exclusive" data and has "access to

---

automatically ripple across the others, so leasing, accounting, operations, and reporting all feed each other in real time.").

[36] Joint Comm. On Tech. and Science, Bill Study, *Algorithmic Pricing Devices* (Aug. 2025), at 5, available at https://dls.virginia.gov/commissions/jcots/materials/algorithmic-pricing_devices_bill_study_2025.pdf (emphasis added).

[37] Joint Comm. On Tech. and Science, Bill Study, *Algorithmic Pricing Devices* (Aug. 2025), at 4, available at https://dls.virginia.gov/commissions/jcots/materials/algorithmic-pricing_devices_bill_study_2025.pdf (emphasis added).

[38] *Id.* (internal citation omitted) (emphasis added).

[39] YARDI, ABOUT YARDI MATRIX, https://www.yardimatrix.com/About-Us (last accessed June 29, 2026).

[40] YARDI MATRIX BROCHURE, available for download at https://www.yardimatrix.com/pdf/MultifamilyMarketCoverage/Matrix_Multifamily_brochure.pdf (emphasis added).

[41] YARDI, ABOUT YARDI MATRIX, https://www.yardimatrix.com/About-Us (last accessed June 11, 2026).

*patented … **rental rate, occupancy history** and current property manager information.*"[42]

## YARDI MATRIX MULTIFAMILY



**REAL-TIME PROPERTY DATA**

Gain access to patented improvement and location ratings, rental rate, occupancy history and current property manager information.



**LOAN DATA**

Search for acquisition prospects by loan maturity schedules, lenders, borrowers, loan terms and estimated DSCR/LTV ratios.



**TRENDS & FORECASTS**

Stay current with monthly national reports, metro reports and quarterly forecasts of rental rates, rent growth and occupancy across markets and submarkets.



**NEW SUPPLY PIPELINE**

Get insight into new supply pipeline information at the asset, competitive set and market levels.



**MATRIX EXPERT**

Access exclusive aggregated and anonymized residential revenue and expense comps.

 yardimatrix.com/multifamily | matrix@yardi.com or (480) 663-1149

55.     Yardi Matrix also allows landlords to "access exclusive research[.]"[43]

56.     Indeed, Yardi engages in market pricing surveys that capture nonpublic data. The Yardi Matrix "Rent Survey updates an apartment community's rents, current rent specials, and several other factors subject to frequent change. The process requires calling apartment communities and asking various questions."[44]

57.     Yardi gathers this information by hiring for a position called the "Rent Surveyor."[45]

---

[42] YARDI MATRIX BROCHURE, available for download at https://www.yardimatrix.com/pdf/MultifamilyMarketCoverage/Matrix_Multifamily_brochure.pdf (emphasis added).

[43] YARDI MATRIX BROCHURE, https://www.yardimatrix.com/pdf/MultifamilyMarketCoverage/Matrix_Multifamily_brochure.pdf, available for download at https://www.yardimatrix.com/Property-Types/Multifamily.

[44] YARDI MATRIX RENT SURVEY, https://yardirentsurvey.wordpress.com/ (last accessed June 11, 2026).

[45] *See id.*

---

Yardi directs Rent Surveyors to pretend to be "potential renter[s]" to obtain information about residential rental properties, including rental rates: "Surveys must be conducted as a potential renter to ensure accuracy of information. This requires that you be willing to play the role of a renter."[46]

> Our product [Yardi Matrix] provides information on various dynamic aspects of apartment community operations, requiring that regular assessments be conducted. The Rent Survey updates an apartment community's **rents, current rent specials, and several other factors** subject to frequent change. The process requires **calling apartment communities** and asking various questions.[47]

**YARDI MATRIX RENT SURVEY**

**YARDI MATRIX'S** Spring 2026 Rent Survey begins Wednesday, April 29th!

**About YARDI MATRIX**

Yardi Matrix, formerly known as Pierce-Eislen, Inc.®, was founded in March 2000 and acquired in July 2013 by Yardi Systems, Inc., a Santa Barbara, California software company focused on commercial real estate industry applications.

The Yardi Matrix apartment information service is a high-performance system with the sole function of supporting the commercial apartment industry's dominant participants. The company's services monitor the 50+ unit apartment universe from the property level to the submarket/market level in a form unique within the commercial apartment information industry.

**Spring 2026 Rent Survey Begins** April 29, 2026

Yardi Matrix Spring 2026 Rent Survey

Next Steps!

Rent Survey Contact Information

58.    The fact that Yardi gathers nonpublic information to feed the Yardi Matrix, via its Rent Survey, is expressly confirmed on the Yardi Matrix website:[48]

> Status of rental promotional activity in the form of concessions offered to induce rental is assessed three times annually by telephone survey among competitively rented (market/rate) properties of 50 units and larger in size.

---

[46] *Id.*

[47] *Id.* (emphasis added).

[48] *See, e.g.*, YARDI MATRIX, HOW WE REPORT MULTIFAMILY RENTAL MARKET CONDITIONS, https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions (last accessed June 29, 2026) ("Rental rates are gathered as a prospective renter by telephone survey, ….").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    16

The survey is taken as if the caller were a renter. Survey periods include: January/February; May/June; September/October. As rental promotions are dynamic - flexible in timing, duration, and depth - survey results illustrate the relative extent of concessions offered on-average during a specific period. …

All market/rate properties of 50 units and larger in size are included in the concessions survey.[49]

59.    Yardi Matrix also "pierce[s]" "single-asset entities – limited partnerships, limited liability corporations, or trusts – are pierced, and the actual owner, and how to contact them, [is] disclosed."[50]  The piercing of these single-asset entities across "189 United States markets" heavily suggests that Yardi's algorithm pulls on nonpublic information.[51]

60.    In turn, "Yardi Matrix [] uses [such] data … to create aggregated … operating expense, revenue, and operational metric data that improves underwriting analysis and competitive benchmarking."[52]  Yardi analogizes the Yardi Matrix to an oil processor: "Raw Data, Like Crude Oil, Must Be Processed To Become Useful."[53]

61.    Yardi boasts: "The Yardi Matrix product is the apartment information industry's only fully-bundled product, providing … reporting on ... Apartment inventory status; sale activity; new development, and; rental market conditions. New development, and investor activity are illustrated at the submarket, or market, levels, continuously updated on-the-fly."[54]

---

[49] YARDI MATRIX, HOW WE SURVEY APARTMENT RENTAL CONCESSIONS, https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions/How-We-Survey-Rental-Concessions (last accessed June 11, 2026).

[50] https://www.yardimatrix.com/about-us (last accessed June 29, 2026).

[51] *See id.* ("Since initiating Phoenix services in February, 2001, the company has extended presence into 189 United States markets, extending in geography from the Pacific Northwest to the Mid-Atlantic.").

[52] YARDI, ABOUT YARDI MATRIX, https://www.yardimatrix.com/About-Us (last accessed June 11, 2026).

[53] YARDI, THE YARDI MATRIX ADVANTAGE, https://www.yardimatrix.com/About-Us/The-Matrix-Advantage (last accessed June 11, 2026).

[54] YARDI, ABOUT YARDI MATRIX, https://www.yardimatrix.com/About-Us (last accessed June 11, 2026); *see also id.* (last accessed June 11, 2026) (Yardi Matrix provides "update[s] in near real-time" for what Yardi calls "[c]ritical market descriptive information"—"rather than the traditional industry standard quarterly update[.]").

62. Yardi generates such market intelligence through, *inter alia*, its proprietary, patented technology. This includes the "Yardi Matrix Context® Apartment Rating System,"[55] embodied in United States Patent numbers 7,974,930 and 8,060,450.

63. The Yardi Matrix Context® Apartment Rating System ("Context® System") is "[a]n interactive, computer-implemented system for providing a comparison of at least two real estate properties[.]"[56]

64. As shown in the below image, the Yardi Context® System allows landlords to set rental rates by making rental rate comparisons across properties using nonpublic data. A "screen display may provide such information as … a comparison of actual monthly rental rates, and a comparison of market standard rental rates along with the basis upon which the market standard rental rates were calculated"[57] in a selected geographic location (here, "Scottsdale, Arizona"):

///

///

///

///

///

///

///

///

///

---

[55] *See* YARDI, THE YARDI MATRIX CONTEXT® APARTMENT RATING SYSTEM, https://www.yardimatrix.com/About-Us/Our-Methods/Our-Context-Function (last accessed June 11, 2026).

[56] United States Patent number 7,974,930, at 1. United States Patent number 7,974,930 describes, *inter alia*, a "host system [that] comprises a real estate database" that is "used for the searching, compilation and delivering of relevant property information to users inquiring about the information." *Id.* at 14. The database "may use any other means for acquiring data[.]" *Id.* For example, the host system may include an "input system" that is "configured to permit the manual input of information into real estate database" and which may be "updated on a regular and frequent basis to provide to system users timely and accurate data regarding a real estate property or properties." *Id.*

[57] *Id.* at 19.

SUBJECT PROPERTY: DAKOTA RANCH

UNIT TYPE: THREE BEDROOM/TWO BATH

| PROPERTY NAME/ ADDRESS | SIZE | | YEAR COMPLETED | RATINGS | | MONTHLY RENTAL RATE | | RENTAL RATE ADJUSTMENT BASIS |
|---|---|---|---|---|---|---|---|---|
| | UNITS | SQ. FT. | | PHYSICAL | LOCATION | ACTUAL | MARKET | |
| DAKOTA RANCH 325 STATE ST SCOTTSDALE, ARIZONA | 20 | 1400 | 1998 | A | A | $1245 | $1236 | <$15> FOR FIREPLACE <$25> FOR WASHER/DRYER $14 FOR RESIDENT PAYING WATER $14 FOR RESIDENT PAYING SEWER $3 FOR RESIDENT PAYING TRASH |
| THE COMMONS 370 N. REDFIELD RD SCOTTSDALE, ARIZONA | 34 | 1140 | 1991 | A- | A- | $1225 | $1185 | <$15> FOR FIREPLACE <$25> FOR WASHER/DRYER |
| THE VISTAS 425 N. MAIN ST SCOTTSDALE, ARIZONA | 19 | 1310 | 1998 | A | B+ | $1200 | $1175 | <$25> FOR WASHER/DRYER |

65.    Yardi states that "[a]ctual [r]ent" is "[t]he rate a property charges residents to occupy an apartment[,]"[58] while "[m]arket [s]tandard [r]ents" are "[r]ents [that are] are adjusted from Actual rents."[59]

66.    Yardi explains Market Standard Rents in more detail as follows:

Adjustments reflect the condition that apartment rental rates among floorplans of the same type vary from property-to-property as a consequence of qualitative characteristics influencing desirability, and/or elements of tangible (quantifiable) value included in rental rates. When elements of tangible value are included in a property's rents those elements are recognized in the form of deductions from, or additions to, actual rents to define a Market Standard rental rate.

The Market Standard rent places all properties on a similar plane, eliminating readily quantifiable inequalities (utilities, washers & dryers, direct-access garages, fireplaces) included in rental rates, and adding adjustments when residents pay water, sewer, or trash collection expenses, adjusting rents to a

[58] YARDI MATRIX, HOW WE DEFINE APARTMENT RENTAL RATES, https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions/How-We-Define-Rental-Rates (last accessed June 11, 2026).
[59] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    19

common-denominator. This Market Standard rent adjustment allows direct comparison of a submarket's rents with other submarkets, or adjusts individual unit type rents to a basis allowing more direct comparison with other units of the same type serving a submarket.[60]

67.     Take the following illustrative example: an apartment unit may have an "actual monthly rate of $1000" but, due to various factors—like utility charges and trash fees—only has a market rate of $921.  With this in mind, "the calculated Market Standard Rent of $921 for this three-bedroom apartment of the subject apartment complex can be compared to the Market Standard Rent of other three bedroom apartments to more accurately assess such factors as the apartments value and its income potential."[61]

68.     Put simply, the Context® System shows where a landlord's rental price (both actual and market) falls among other landlords for a large number of similar properties.[62]

69.     Thus, Yardi Matrix provides "[a]ctive reporting of market dynamics"[63] including "[r]ental rates and concessions; and market occupancy." [64]

**Yardi Elevate**

70.     Yardi provides "[r]evenue management" and "pricing optimization" through Yardi Elevate.

---

[60] *Id.*; *see also* United States Patent number 7,974,930, at 15 (the "real estate database [] may store market rental rates, in addition to actual rental rates, for a more accurate comparison of apartment complex properties."); *id.* at 18-19 (the Yardi host system "calculate[s]" Market Standard Values (MSVs) that incorporate "an actual monthly rent.").

[61] *Id.*

[62] *See, e.g.*, United States Patent number 8,060,450, at 20.

[63] YARDI, THE YARDI MATRIX ADVANTAGE, https://www.yardimatrix.com/About-Us/The-Matrix-Advantage (last accessed June 11, 2026).

[64] YARDI, HOW WE REPORT MULTIFAMILY RENTAL MARKET CONDITIONS, https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Report-Rental-Market-Conditions. *See also id.* ("Rental Rate Reporting[:] Rental rates are gathered as a prospective renter by telephone survey, then reported in both Actual, and Market Rate, formats. The market rate is an actual rate, adjusted to apply an apples-to-apples comparison."); *id.* ("Rental Concessions[:] Rental rate concessions are gathered as a prospective renter, by telephone survey, and are representative of promotional offerings made available to prospective residents at the time a survey was completed. When complete, surveys are tabulated to provide a representation of concessions in effect during the survey period.").

---

71.     Yardi says that landlords can "[c]ombine Yardi Elevate with property management, … for an integrated ecosystem that drives peak asset performance."[65]

72.     Yardi Elevate is comprised of Revenue IQ, Forecast IQ, and Asset IQ.

Asset IQ:  Helps Defendant "optimize revenue using powerful data."[66] As a "[b]enchmarking software for apartments[,]" Asset IQ "allows property managers to **compare their properties' performance against industry standards and competitors**."[67] "Residential property benchmarking involves comparing the performance of your properties against similar properties in the market."[68]

Forecast IQ:  "[G]ives [Defendant] detailed revenue and expense forecasting using your performance data."[69] "Residential financial forecasting software provides insights into future financial trends, helping property managers develop long-term strategies. **By analyzing past performance and current market conditions**, the software aids in setting realistic financial goals and creating sustainable budgets."[70]

Revenue IQ:  "**Revenue IQ prices new and renewal leases** using information across your real-time inventory, traffic and market conditions."[71] "Gain full visibility into pricing movement and operational performance. Track rent changes and **understand market positioning using real-time data from your property** and publicly available competitor asking rents."[72]

///

///

///

---

[65] YARDI ELEVATE, REVENUE IQ BROCHURE, https://www.yardi.com/resources/revenue-iq-brochure/ (last accessed June 11, 2026).

[66] *See* YARDI, ASSET IQ, https://www.yardi.com/product/asset-iq/.

[67] YARDI, ASSET IQ | FAQ, https://www.yardi.com/product/asset-iq/ (emphasis added) (last accessed June 11, 2026).

[68] YARDI, ASSET IQ | FAQ, https://www.yardi.com/product/asset-iq/.

[69] YARDI, FORECAST IQ, available at https://www.yardi.com/product/forecast-iq/ (last accessed June 11, 2026).

[70] YARDI, FORECAST IQ | FAQ, available at https://www.yardi.com/product/forecast-iq/ (emphasis added) (last accessed June 11, 2026).

[71] YARDI, REVENUE IQ, available at https://www.yardi.com/product/revenue-iq/ (emphasis added) (last accessed June 11, 2026).

[72] *Id.* (emphasis added).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    21



73.    The bill study cited *supra*, conducted by the Virginia Joint Commission on Technology & Science, warns:

> **Revenue management software** is … [a] tool that supports landlords and property managers in optimizing pricing, maximizing revenue, and improve profitability. ***The algorithmic pricing device is typically a component within revenue management software that uses a proprietary set of mathematical equations to derive suggested prices for rental units***. This pricing algorithm typically accounts for publicly accessible market values for comparable floor plans (e.g., 1 bedroom, 1 bath) that are routinely (e.g., weekly) web-scraped by the software company or through a third-party aggregator. ***The pricing algorithm can also incorporate nonpublic internal inputs within the property management software*** if the landlords

grant access to their internally held data stored in their property and/or revenue management software.[73]

*[A]ny of the nonpublic data inputs within the different categories (e.g., property, tenant, financial and maintenance information)* captured in the property management software can be used to ***train and execute the algorithmic pricing software*** towards suggesting a price based on nonpublic data across competitors.[74]

**IV.    Defendant Greystar Management Admits It Used RealPage's and Yardi's Software**

74.    Greystar Management has admitted in antitrust litigation that it uses RealPage and Yardi software.

75.    For example, in Defendant Greystar Management Services, LLC's Answer and Affirmative Defenses in *Platkin et al. v. RealPage, Inc. et al.*, No. 2:25-cv-03057, ECF No. 174 (D.N.J. Apr 14, 2026):

> GMS admits that it has contracted with RealPage to license certain RealPage revenue management software products.  (*Id.* at 7).

> GMS admits that GMS representatives have participated in some user group meetings for LRO and YieldStar.  (*Id.* at 28).

> GMS admits that GMS representatives have participated in some user group meetings for LRO, YieldStar, and AIRM.  (*Id.* at 30).

> GMS admits that GMS representatives have participated in some LRO user group meetings.  (*Id.* at 31).

76.    Similarly, in Defendant Greystar Management Services LLC's Answer to Plaintiff's First Amended Complaint & Affirmative Defenses, *District of Columbia vs. RealPage, Inc. et al.*, No. 2023-CAB-006762, (D.C. Super. Ct. Jan. 22, 2025):

> GMS admits that it manages certain properties that use RealPage revenue management software products.  (*Id.* at 6).

> Greystar admits that Ena Donovan participated in the LRO User Group.  (*Id.* at 38, 40).

---

[73] Joint Comm. On Tech. and Science, Bill Study, *Algorithmic Pricing Devices* (Aug. 2025), at 4, available at https://dls.virginia.gov/commissions/jcots/materials/algorithmic-pricing_devices_bill_study_2025.pdf (emphasis added).

[74] *Id.* at 5 (emphasis added).

> GMS admits that GMS representatives have been invited to participate in the YieldStar User Group. (*Id.* at 42).

77. And in Defendant Greystar Management Services LLC's Answer to Consolidated Class Action Complaint, *Duffy v. Yardi Systems Inc. et al.*, No. 2:23-cv-01391, ECF No. 361, at 34 (W.D. Wash. Apr. 21, 2025):

> GMS admits that it, and/or its corporate affiliates, manages certain properties that use, or have used, Yardi's revenue management software products.

78. As of 2024, "RealPage's algorithmic coverage," including at least LRO and AIRM/YieldStar,[75] extends to large swaths of metropolitan areas" including San Francisco:



Figure 1. RealPage Rental Pricing Software Usage: Share of Multifamily Rental Units by Metro in 2023

As of December 12, 2024 at 8:00am.

---

[75] This chart presumably does not take into account the Market Analysis algorithmic software.

79.    As part of the suit brought by the U.S. Department of Justice, Defendant Greystar Management Services LLC settled with the California Attorney General for $7 million for using RealPage's algorithms to set California tenants' rental prices.[76]

80.    Greystar is also one of various companies mentioned on the Yardi website as of June 2026.  "Companies"—including but not limited to Greystar—"bring *together* real estate data on Yardi to … grow [their] revenue."[77]  (Emphasis added).



V.    **The Use of Algorithmic Devices to Set Rents or Occupancy Levels Harms San Francisco Tenants**

81.    As the City and County of San Francisco has recognized, the use of algorithmic rent devices to set rents or occupancy levels harms San Francisco tenants.

82.    Economists and regulators agree that the use of algorithmic devices causes economic and social harm.

83.    Economists find that RealPage's algorithmic software inflates rental prices.  The

[76] https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-7-million-settlement-greystar-participating ("California Attorney General Rob Bonta today, as part of a coalition of nine attorneys general, announced a $7 million settlement with Greystar Management Services LLC[.]").

[77] https://www.yardi.com/ (last accessed June 29, 2026).

Council of Economic Advisers to the Biden administration quantified that algorithmic pricing in rental housing increased costs to San Francisco renters by $62 per month on average.[78]



84.     Additionally, the White House said:

> We find that … algorithmic pricing cost[s] renters in algorithm-utilizing units $70 a month, or 4% of rent, on average nationally. In six major metros, the cost exceeds $100 a month. Monthly costs … units using RealPage software by metro are shown in Figure 2. The total cost to renters in 2023 was approximately $3.8 billion.[79]

85.     The use of algorithmic devices in setting rent and occupancy levels can further social harms that pervade the housing market, including but not limited to discrimination:

---

[78] Council of Economic Advisers, *The Cost of Anticompetitive Pricing Algorithms in Rental Housing*, THE WHITE HOUSE (Dec. 17, 2024), available at https://bidenwhitehouse.archives.gov/cea/written-materials/2024/12/17/the-cost-of-anticompetitive-pricing-algorithms-in-rental-housing/.

[79] *Id.*

> Mounting evidence reveals that algorithmic decisions can produce biased, discriminatory, and unfair outcomes in a variety of high-stakes economic spheres including employment, credit, health care, and housing.[80]

86. For example, former FTC Commissioner Rebecca Kelly Slaughter notes that AI has led to proxy discrimination, or, "the use of facially neutral factors that generate discriminatory results[.]"[81] "Facebook's use of Lookalike Audiences that facilitated housing discrimination presents one of the clearest illustrations of proxy discrimination."[82]

87. "This problem may persist across ... algorithms"[83] including the RealPage and Yardi algorithmic software at issue here.

88. This is especially so where the RealPage and Yardi algorithmic software captures niche, granular insights and lease details. "[A]lgorithms … bring the risk of perpetuating or even amplifying longstanding patterns of housing-related discrimination."[84]

## CLASS ALLEGATIONS

89. Plaintiff seeks to represent a class defined as:

> All persons who rented apartments from Defendants in San Francisco during the class period (the "Class").

90. Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

91. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment,

---

[80] Rebecca Kelly Slaughter (with J. Kopec and M. Batal), *Algorithms and Economic Justice: A Taxonomy of Harms and a Path Forward for the Federal Trade Commission*, YALE INFORMATION SOCIETY PROJECT | YALE JOURNAL OF LAW & TECHNOLOGY VOL. 23. (Aug. 2021), at 3, available at https://law.yale.edu/sites/default/files/area/center/isp/documents/algorithms_and_economic_justice_master_final.pdf (internal citation omitted).

[81] *Id.* at 23.

[82] *Id.* at 21.

[83] *Id.* at 22.

[84] Foggo, V., & Villasenor, J., Abstract for *Algorithms, Housing Discrimination, and the New Disparate Impact Rule*, 22 SCIENCE AND TECHNOLOGY LAW REVIEW (2021), at 1, available at https://journals.library.columbia.edu/index.php/stlr/article/view/7963.

---

and accrual issues, and ending on the date of entry of judgement.

92.     The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

93.     **Numerosity/Ascertainability:**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party records, such as those of RealPage and Yardi.

94.     **Typicality:**  The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, had their rent or occupancy for their residential dwelling unit set using an algorithmic device.

95.     **Adequate Representation:**  Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of complex class action litigation generally, and in litigation concerning unfair and anti-competitive practices specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

96.     **Commonality and Predominance:**  There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the

individual circumstances of any Class member, include, but are not limited to, the following: whether Defendants violated San Francisco Admin. Code c. 37, § 37.10C(b), whether Defendants use non-public competitor data, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, prejudgment interest and costs of this suit.

97.    **Superiority:**  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## COUNT I

### Violation of San Francisco Admin. Code c. 37, § 37.10C(b)

98.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

99.    The San Francisco Administrative Code makes it "unlawful to sell, license, or otherwise provide to San Francisco landlords any algorithmic device that sets, recommends, or advises on rents or occupancy levels that may be achieved for residential dwelling units in San Francisco." San Francisco Admin. Code c. 37, § 37.10C(a).

100.    The San Francisco Administrative Code also makes it unlawful for a landlord to use an algorithmic device when setting rents or occupancy levels for residential dwelling units in San Francisco.  San Francisco Admin. Code c. 37, § 37.10C(b).

101.    San Francisco Admin. Code c. 37, § 37.2(h) defines a landlord as "[a]n owner, lessor, sublessor, who receives or is entitled to receive rent for the use and occupancy of any residential

rental unit or portion thereof in the City and County of San Francisco, and the agent, representative or successor of any of the foregoing."

102.    Defendant Greystar Management is a landlord because it is named as such in Plaintiff's lease.   Defendant Greystar California, Inc. is a landlord because it is named as the "owner's authorized agent" in Plaintiff's lease.

103.    San Francisco Admin. Code c. 37, § 37.10C(c)(1) defines an "[a]lgorithmic device" as follows:

> [A] device commonly known as revenue management software, that uses one or more algorithms to perform calculations of non-public competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising a landlord on whether to leave a unit vacant or on the amount of rent that the landlord may obtain for that unit.

104.    The RealPage software, including Yieldstar/AIRM, LRO, and Market Analytics, use one or more algorithms to advise Defendants on setting rent and/or occupancy.

105.    The Yardi software, including Yardi Matrix, Elevate, Revenue IQ, Forecast IQ, Asset IQ, and the Context® System, use one or more algorithms to advise Defendants on setting rent and/or occupancy.

106.    San Francisco Admin. Code c. 37, § 37.10C(c)(2) defines "[n]on-public competitor data" as follows:

> [I]nformation that is not available to the general public, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market.

107.    The RealPage and Yardi software use one or more algorithms to perform calculations of non-public, proprietary data.

108.    Under the Administrative Code, "[a] tenant may file a civil action for violations of subsection (b), for injunctive relief, money damages, and/or civil penalties of up to $1,000 per violation."  San Francisco Admin. Code c. 37, § 37.10C(d)(2).

109.    In violation of the San Francisco Administrative Code, Defendants used RealPage

and Yardi algorithmic devices when setting rents or occupancy levels for Plaintiff and Class Members' residential dwelling units in San Francisco.

110.    Pursuant to San Francisco Admin. Code c. 37, § 37.10C(d)(2), Plaintiff and Class Members seek (1) injunctive relief, (2) money damages, (3) civil penalties of up to $1,000 per violation; and (4) reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

    a.  For a determination that this action is a proper class action;

    b.  For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

    c.  For an order declaring that Defendants' conduct violates the statute referenced herein;

    d.  For an order enjoining the illegal acts detailed herein;

    e.  For an order finding in favor of Plaintiff and Class on all counts asserted herein;

    f.  For an award of compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

    g.  For prejudgment interest on all amounts awarded;

    h.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

    i.  For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 2, 2026                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                31

L. Timothy Fisher (SBN 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*